Dean Kawamoto, CSB # 232032
dkawamoto@kellerrohrback.com
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
Telephone: (206) 623-1900
Fax: (206) 623-3384

*Counsel for Plaintiff City of
Durham, North Carolina*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF DURHAM, NORTH CAROLINA,<br><br>                    Plaintiff,<br><br>     v.<br><br>HYUNDAI MOTOR COMPANY, HYUNDAI MOTOR AMERICA, KIA CORPORATION, and KIA AMERICA, INC.,<br><br>                    Defendants. | No. 8:24-cv-01662<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

TABLE OF CONTENTS

I.    INTRODUCTION ......................................................................................1

II.   JURISDICTION AND VENUE ................................................................5

      A.    Subject Matter Jurisdiction ..........................................................5

      B.    Personal Jurisdiction ....................................................................5

            1.    HMC's and KC's Forum-Related Activities ........................6

            2.    HMC's and KC's Control Over Their Respective
                  Subsidiaries.........................................................................8

      C.    Venue .............................................................................................9

III.  PARTIES.................................................................................................10

      A.    Plaintiff........................................................................................10

      B.    Defendants ...................................................................................10

            1.    Hyundai Motor Company ...................................................10

            2.    Hyundai Motor America .....................................................10

            3.    Kia Corporation .................................................................11

            4.    Kia America, Inc.................................................................11

IV.   THE KIA HYUNDAI THEFT WAVE ...................................................12

      A.    Measures to Prevent Vehicle Thefts Have Existed for
            over a Century .............................................................................12

      B.    Hyundai and Kia Deviated from the Industry Standard by
            Electing Not to Include Immobilizers or Other
            Reasonable Anti-Theft Technology in the Susceptible
            Vehicles .......................................................................................20

      C.    The Lack of Reasonable Anti-Theft Devices in Most
            Hyundai and Kia Vehicles Has Led to a Wave of Thefts ...............23

i

D.    Car Thefts Imperil Public Safety ......................................... 25

E.    Car Thefts Drain Public Resources and Frustrate Public Policy ........................................................................................ 29

V.    THE CONTINUING PUBLIC NUISANCE AND DEFENDANTS' LATE, INSUFFICIENT RESPONSE .......................... 31

VI.    IMPACTS ON PLAINTIFF ......................................................... 37

VII.    CAUSES OF ACTION ................................................................ 40

COUNT ONE — PUBLIC NUISANCE ................................................ 40

COUNT TWO — NEGLIGENCE ........................................................ 45

VIII.    PRAYER FOR RELIEF .............................................................. 49

IX.    DEMAND FOR JURY TRIAL .................................................... 50

## I.    INTRODUCTION

1.    There is an inextricable link between preventing vehicle theft and protecting public safety. Making sure cars are not sitting ducks that are simple to steal protects both property and the public by keeping dangerous drivers in stolen vehicles off the roads. Two car manufacturers made a business decision not to equip the vehicles they sell with reasonable anti-theft technology, leaving counties and cities across the nation to deal with massive public safety consequences. Despite taking some initial steps to discourage thefts, Defendants have been unable to abate the dangerous crime wave unleashed on communities nationwide—a crime wave that continues to this day.

2.    The days of "hotwiring" cars with nothing more than a screwdriver are largely over. In most recent car models, the ignition key emits a radio signal that prompts a computer in the car to disengage an immobilizer device and allows the car to start and move. But recent Hyundai and Kia models are a glaring exception.

3.    For most model years between 2011 and 2022, long after other carmakers adopted immobilizer technology that ensured car ignitions could not be started without their keys, Defendants Hyundai Motor Company ("HMC"), Hyundai Motor America ("HMA" and, with HMC, collectively "Hyundai"), Kia Corporation ("KC"), and Kia America, Inc. ("KA" and, with KC, collectively "Kia") intentionally ignored industry-standard practices in the name of profit. Specifically, upon information and belief, at all relevant times, Defendants designed, manufactured, and distributed the following automobile models without engine immobilizers or other reasonable anti-theft technology: Hyundai Accent,

1

Elantra, Elantra GT, Elantra Coupe, Elantra Touring, Genesis Coupe, Kona, Palisade, Santa Fe, Santa Fe Sport, Santa Fe XL, Sonata, Tucson, Veloster, Venue, and Veracruz; and the Kia Forte, K5, Optima, Rio, Sedona, Seltos, Sorento, Soul, and Sportage. These vehicles, when manufactured and sold without engine immobilizers or other reasonable anti-theft technology, are referred to hereinafter as the "Susceptible Vehicles."

4.    As a result, online videos demonstrate how easy it is to steal Hyundai and Kia vehicles. In many cases, thieves use tools no more advanced than a USB cable. Hyundai's and Kia's business decisions to reduce costs, and thereby boost profits, by choosing not to equip their vehicles with immobilizers or other reasonable anti-theft technology have resulted in a dangerous rash of thefts. This vehicular crime wave has had a significant impact on law enforcement operations, emergency services, and public safety, particularly for the City of Durham, North Carolina ("Plaintiff" or "Durham").

5.    In the 1960s and 1970s, all that was needed for a successful vehicle heist was a little brute force (to crack open the ignition column) and a key-shaped object to start the car and drive off within seconds. Thanks to modern technology, this is no longer the case for most cars.

6.    Hyundai and Kia are unique among automobile manufacturers in failing to install engine immobilizers or other reasonable anti-theft technology in most of their cars. This is not because the technology is somehow beyond them—in fact, Hyundai and Kia vehicles sold in the European and Canadian markets incorporate vehicle immobilizers, because regulations there expressly require them.

2

In the United States, meanwhile, Hyundai and Kia have decided to trade public safety for profits.

7.      The difference between the proportion of Hyundai and Kia vehicle models with immobilizers compared to all other manufacturers is staggering: for the 2015 model year, for example, only **26%** of Hyundai and Kia vehicles in the United States were equipped with immobilizers, compared to **96%** of vehicles from all other manufacturers.[1]

8.      Hyundai and Kia are aware of the well-documented benefit of immobilizer technology in preventing thefts, as they opted to install engine immobilizers in their higher end models and in all of their 2023 vehicles.

9.      Hyundai's and Kia's decisions to put profits over public safety have had devastating consequences for Plaintiff and its residents. Defendants' failure to install industry-standard immobilization technology or other reasonable anti-theft measures in the Susceptible Vehicles, notwithstanding decades of research supporting the deterrent effects of such technology,[2] has opened the floodgates to vehicle theft, reckless driving, crime sprees, and endangered public safety.

---

[1] *Hyundai and Kia theft losses*, 38 HLDI Bull. 28, 2 (Dec. 2021), https://www.iihs.org/media/0e14ba17-a3c2-4375-8e66-081df9101ed2/opm7QA/HLDI%20Research/Bulletins/hldi_bulletin_38-28.pdf.

[2] Petition for Exemption From the Vehicle Theft Prevention Standard; Hyundai-Kia America Technical Center, Inc., 72 Fed. Reg. 39,661 (July 19, 2007), https://www.govinfo.gov/content/pkg/FR-2007-07-19/pdf/FR-2007-07-19.pdf; *see also* Petition for Exemption From the Vehicle Theft Prevention Standard; Hyundai-Kia America Technical Center, Inc., 75 Fed. Reg. 1,447 (Jan. 11, 2010), https://www.govinfo.gov/content/pkg/FR-2010-01-11/pdf/2010-236.pdf (NHTSA notice granting an identical exemption for the Kia Amanti vehicle line beginning in model year 2009 based on Defendant Kia's representation that the immobilizer installation for that specific model should substantially reduce theft rates).

10.     This epidemic started in Milwaukee and spread nationwide. By June 2021, the Milwaukee Police Department reported that the theft of Hyundai and Kia vehicles had increased by 2,500% since the previous year, with an average of 30 cars being stolen per day.[3] This trend then spread nationwide, enabled by millions of Hyundai and Kia vehicles lacking immobilizers or other reasonable anti-theft technology. As explained below, the crime wave continues to this day in communities coast to coast—and those communities are left to pay the price.

11.     Vehicle theft is not only a property crime affecting vehicle owners, but it also constitutes a grave threat to public safety. Vehicle theft goes hand in hand with reckless driving, which in turn can result in injuries and/or death. It can result in increased violence, as many car owners are unlikely to part with their vehicles willingly. It also consumes law enforcement and emergency resources and deprives the public of safe streets and sidewalks.

12.     The skyrocketing rate of Kia and Hyundai vehicle thefts has drastically impacted Plaintiff's resources, including those of its first responders. Its residents are subjected to increasingly dangerous conditions on their streets, as car thieves (many of them teenagers) are taking advantage of Hyundai's and Kia's failures and engaging in reckless driving, endangering Plaintiff's employees, residents, and property.

---

[3] James Gilboy, *Why Milwaukee Might Sue Hyundai, Kia Over Stolen Car Epidemic*, TheDrive.com (Dec. 11, 2021, 11:15 AM), https://www.thedrive.com/news/43454/why-milwaukee-might-sue-hyundai-kia-over-stolen-car-epidemic.

4

13.    Defendants' conduct has created a public nuisance that could have been avoided had they followed industry-wide standards and installed immobilizer devices or taken other reasonable measures to deter thefts of their vehicles.

14.    Among other harms, Plaintiff has been forced to divert funds and risk officer and public safety to combat the growing burden caused by increased Hyundai and Kia vehicle thefts and their many associated dangers, including reckless driving.

## II.    JURISDICTION AND VENUE

### A.    Subject Matter Jurisdiction

15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), as the amount in controversy exceeds $75,000 and there is complete diversity between the parties. Plaintiff is regarded as a citizen of the State of North Carolina, for the purposes of diversity jurisdiction. *Bullard v. City of Cisco*, 290 U.S. 179, 187 (1933). Defendants HMA and KA are citizens of the State of California, where they are headquartered and incorporated. Defendants HMC and KC are both multinational automakers, headquartered in Seoul, South Korea.

### B.    Personal Jurisdiction

16.    This Court has general personal jurisdiction over Defendants HMA and KA because they are incorporated and headquartered in the State of California. HMA and KA have transacted and done business in the State of California and in this judicial district.

17.    As detailed below, this Court has specific jurisdiction over HMC and KC under the long-arm statute of California based on (1) their forum-related

activities from which this case arises; (2) the forum-related activities of HMC's primary domestic subsidiary, HMA, which HMC substantially controls; and (3) the forum-related activities of KC's primary domestic subsidiary, KA, which KC substantially controls.

### 1.    HMC's and KC's Forum-Related Activities

18.    HMC is a South Korea-based company, and its substantial activities directed at the United States give rise to and relate to Plaintiff's claims.

19.    In a recent complaint to enforce its trademark rights, HMC represented that it "currently designs, manufactures, markets, distributes, and sells a wide range of automobile and related automobile parts to over 190 countries throughout the world, including the United States, under the trademark 'Hyundai.'"[4]

20.    HMC and KC design, manufacture, market, distribute, and sell the Susceptible Vehicles under their registered trademarks "Hyundai" and "Kia," respectively. Between 2011 and 2022, when the Susceptible Vehicles were sold and distributed in Plaintiff's jurisdiction, HMC and KC purposefully availed themselves of the United States' legal protections by registering and maintaining registrations with the United States government for trademarks associated with their vehicles and parts, which HMC and KC used to identify and distinguish their respective vehicles and parts in the United States, this district, and Plaintiff's jurisdiction.

21.    HMC and KC purposefully availed themselves of markets in the United States, including in this district and Plaintiff's jurisdiction, as each company

---

[4] First Amended Complaint at 6, *Hyundai Motor Am., Inc. v. Midwest Indus. Supply Co.*, No. 2:17-cv-3010-JCM-GWF (D. Nev. Nov. 21, 2018), Dkt. No. 34.

sells 500 thousand vehicles per year in this market through their respective domestic subsidiaries, HMA and KA.

22.     HMC and KC manufactured over eight million of the Susceptible Vehicles, which were delivered to HMA and KA for sale in the United States. Upon information and belief, HMC and KC manufactured the majority of the Susceptible Vehicles overseas in South Korea. However, HMC and KC segregated the Susceptible Vehicles intended for sale in the United States and shipped those vehicles to the United States with full knowledge and intent that HMA and KA would distribute them across the country.

23.     Rather than passively placing the Susceptible Vehicles into the stream of commerce, HMC and KC intentionally targeted the distribution of the Susceptible Vehicles into United States markets specifically, because engine immobilizers are not expressly required by law to sell the vehicles in this country.

24.     HMC and KC played instrumental roles in HMA's and KA's analysis and decision-making processes related to the design and/or manufacture of the Susceptible Vehicles without reasonable anti-theft technology, such as engine immobilizers.

25.     Upon information and belief, HMC and KC both were involved in monitoring vehicle thefts of the Susceptible Vehicles, as reported by their respective subsidiaries, HMA and KA.

7

26.     HMC and KC purposely availed themselves of markets in the United States by regularly submitting applications to the Environmental Protection Agency to obtain certification required for the sale of their vehicles in the United States.[5]

**2.    HMC's and KC's Control Over Their Respective Subsidiaries**

27.     HMC and KC exercise control over HMA and KA, respectively, through both formal and informal means.

28.     Upon information and belief, HMC and KC possess the power to appoint board members to HMA and KA, respectively, and both HMC and KC have exercised this power.

29.     HMC operates a "Global Command and Control Center" with "walls covered with television screens and computer monitors" that track "every operating line at 27 plants in the world, in real time, 24 hours a day, 365 days a year."[6]

---

[5] *See, e.g.*, Letter from Hyundai America Technical Center to Director Linc Wehrly re: Request for GHG credit for High Efficiency Alternator Technology (June 10, 2019), https://www.epa.gov/sites/default/files/2019-07/documents/kmc-off-cycle-ghg-credit-high-efficiency-alternator-2019-06-10.pdf (writing on behalf of KC, f/k/a Kia Motors Corporation); *see also* Letter from Hyundai America Technical Center to Director Linc Wehrly re: Request for GHG Off-Cycle Credit for HVAC Brushless Motor Technology in 2020 Model Year and later HMC vehicles (Dec. 15, 2020), https://www.epa.gov/system/files/documents/2022-09/hyundai-ghg-credit-pwm-hvac-blm-apl-2020-12-15.pdf.

[6] William J. Holstein, *Hyundai's Capabilities Play*, 70 Strategy & Bus. 62, 67–68 (Spring 2013), https://digitaledition.strategy-business.com/publication/?m=6320&i=145911&p=70&ver=html5.

8

30.    The production chief for a Hyundai plant in Alabama noted that if there is "a hiccup at any of those boards, headquarters wants to know what needs to be done about it—right now[.]"[7]

31.    Upon information and belief, KC representatives similarly monitor Kia's global operations from HMC's Global Command and Control Center.

32.    Senior executives in South Korea for HMC and KC also regularly visit Hyundai and Kia plants and offices throughout the United States, including HMA's and KA's California headquarters, both of which are located in this district.

33.    The common executives for HMC and HMA frequently overlap. Jose Muñoz, for example, is the current Global Chief Operating Officer of HMC and serves as the President and CEO of HMA. Meanwhile, Brian Latouf serves as the Global Chief Safety Officer for HMC and serves as the Chief Safety Officer of HMA.

34.    KC and KA also share executive employees. SeongKyu (Sean) Yoo serves as President and CEO of KA, as well as Senior Managing Director of KC. Additionally, HMC and KC have overlapping management, with Eui-Sun Chung serving as the President of KC and the Executive Vice Chairman of HMC.

35.    Last, HMC and KC control the public name and brand of HMA and KA, respectively.

**C.    Venue**

36.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants transact substantial business in this district. Venue is also

---

[7] *Id.* at 68.

9

proper for HMA and KA because they are headquartered here, have research and development offices here, and a substantial part of the events/omissions giving rise to the claims occurred in this district.

### III.   PARTIES

#### A.   Plaintiff

37.   Plaintiff, the City of Durham, North Carolina is a municipal corporation organized and operating under the laws of the State of North Carolina. Durham has approximately 283,500 residents, and it is the fourth-largest city in the state. Durham's principal offices are located at 101 City Hall Plaza, Durham, North Carolina 27701.

#### B.   Defendants

##### 1.   Hyundai Motor Company

38.   Defendant Hyundai Motor Company is a multinational automaker headquartered in Seoul, South Korea. HMC, together with Defendants Kia Corporation, Kia America, Inc., and Hyundai Motor America, comprise the Hyundai Motor Group, which designs, manufactures, and distributes the Susceptible Vehicles referenced in this Complaint. HMC is the parent of Hyundai Motor America.

##### 2.   Hyundai Motor America

39.   Defendant Hyundai Motor America is an automobile designer, manufacturer, distributor, and/or servicer of new motor vehicles under the Hyundai brand doing business within the United States. HMA is incorporated and headquartered in the State of California. HMA's principal place of business is

located at 10550 Talbert Avenue, Fountain Valley, California. HMA distributes, markets, leases, warrants, and oversees regulatory compliance and warranty claims for Hyundai-brand vehicles through a network of over 800 dealers throughout the United States from its headquarters in California. Defendant HMA engages in continuous and substantial business in California.

### 3. Kia Corporation

40.    Defendant Kia Corporation is a multinational automaker headquartered in Seoul, South Korea. KC is the parent corporation of Kia America, Inc. As of December 31, 2017, Defendant KC's largest shareholder was HMC, which holds 33.88% of KC's stock.[8]

### 4. Kia America, Inc.

41.    Defendant Kia America, Inc. is a manufacturer and distributor of new motor vehicles under the Kia brand and is incorporated and headquartered in the State of California. KA's principal place of business is located at 111 Peters Canyon Road, Irvine, California. KA distributes, markets, leases, warrants, and oversees regulatory compliance and warranty claims for Kia-brand vehicles through a network of over 700 dealers throughout the United States from its headquarters in California. Defendant KA engages in continuous and substantial business in California.

---

[8] *The Future: Kia Motors Annual Report 2017*, Kia, 11, https://worldwide.kia.com/int/company/ir/archive/annual-report/download/B200002757/F200012579 (last visited Apr. 17, 2024).

# IV.   THE KIA HYUNDAI THEFT WAVE

## A.   Measures to Prevent Vehicle Thefts Have Existed for over a Century

42.    Since the invention of gasoline-powered automobiles at the close of the nineteenth century, consumers have needed effective ways to keep their vehicles from being stolen. Thus, efforts to prevent theft or unauthorized access to automobiles have tracked vehicle development. In 1919, St. George Evans and Edward B. Birkenbeuel invented the first electric immobilizer/vehicle security system.[9]

43.    Labeled the "Automobile-Theft Preventer" the purpose of Evans and Birkenbeuel's invention was relatively straightforward: "to provide a means for automatically signaling an attempt to move an automobile by unauthorized persons; and to provide a means for locking the electric circuit open, in which case it will be impossible to move the car by its own power."[10]

44.    Evans and Birkenbeuel's immobilizer/alarm system consisted of a three-by-three switch panel that connected to the car's battery, horn, and ignition. Upon exiting a vehicle, a driver could turn a few switches on the panel to different positions that, until released, would divert electricity to the horn instead of the ignition should an unauthorized user attempt to start the vehicle.

---

[9] U.S. Patent No. 1,300,150 (issued Apr. 8, 1919).
[10] *Id.* at col. 1 ll. 14–20.

**Sketches for Evans & Birkenbeuel's "Automobile Theft Preventer"[11]**

45. The timing of the first immobilizer patent coincided with Congress's enactment of the National Motor Vehicle Theft Act, 18 U.S.C. § 2311 *et seq.*, which made the interstate transportation of stolen vehicles a federal crime. The law passed, in part, to respond to the growing number of automobile thefts around the country.

46. As time passed and technology advanced, the United States pursued further efforts to promulgate vehicle safety standards. These efforts were also fueled by the post-war rise in vehicle thefts among juveniles and young adults, "who took cars for joyriding and transportation."[12]

---

[11] *Id.* at figs. 1, 2, 3, 4.

[12] Anthony Dixon & Graham Farrell, *Age-period-cohort effects in half a century of motor vehicle theft in the United States*, 9 Crime Sci. 17, 1, 3 (2020), https://crimesciencejournal.biomedcentral.com/articles/10.1186/s40163-020-00126-5.

47.    In 1966, Congress passed the National Traffic and Motor Vehicle Safety Act (the "Safety Act"), with the aim of administering new motor vehicle and traffic safety standards.[13] Administration of the Safety Act was overseen by the newly created Department of Transportation through its sub-agency: the National Highway Traffic Safety Administration, f/k/a/ the National Traffic Safety Bureau ("NHTSA").

48.    Pursuant to its statutory authority under the Safety Act, NHTSA promulgated numerous federal motor vehicle safety standards ("FMVSS"). Among these standards, FMVSS 114[14] requires minimum theft-protection standards for nearly all passenger vehicles in the United States:

> S1. Scope. This standard specifies vehicle performance requirements intended to reduce the incidence of crashes resulting from theft and accidental rollaway of motor vehicles.
>
> S2. Purpose. The purpose of this standard is to decrease the likelihood that a vehicle is stolen, or accidentally set in motion.
>
> S3. Application. This standard applies to all passenger cars, and to trucks and multipurpose passenger vehicles with a GVWR of 4,536 kilograms (10,000 pounds) or less.
> . . .
> S5.1 Theft Protection.

---

[13] National Traffic and Motor Vehicle Safety Act, Pub. L. 89–563, 80 Stat. 718 (1966).

[14] Standard No. 114; Theft protection and rollaway prevention, 49 C.F.R. § 571.114 (2010) ("FMVSS 114").

> S5.1.1 Each vehicle must have a starting system which, whenever the key is removed from the starting system prevents:
>
> (a)    The normal activation of the vehicle's engine or motor; and
>
> (b)    Either steering, or forward self-mobility, of the vehicle, or both.
>
> . . .
>
> S5.2.2 Except as specified in S5.2.4, the vehicle must be designed such that the transmission or gear selection control cannot move from the "park" position, unless the key is in the starting system.[15]

49.    The main motivation for creating FMVSS 114 was NHTSA's recognition "that stolen cars constitute a major hazard to life and limb on the highways. The evidence shows that cars operated by unauthorized persons are far more likely to cause unreasonable risk of accident, personal injury, and death than those which are driven by authorized individuals."[16]

50.    As early as 1966, studies showed "there were an estimated 94,000 stolen cars involved in accidents"—with "18,000 of these accidents result[ing] in injury to one or more people."[17] Accordingly, NHTSA recognized that "a reduction in the incidence of auto theft would make a substantial contribution to motor vehicle safety" and "protect the many innocent members of the public who are killed and injured by stolen cars each year."[18] To address this safety risk, which is largely tied

---

[15] *Id.*

[16] Motor Vehicle Safety Standard No. 114; Theft Protection; Passenger Cars, 33 Fed. Reg. 83, 6,471 (Apr. 27, 1968), https://www.govinfo.gov/content/pkg/FR-1968-04-27/pdf/FR-1968-04-27.pdf#page=1.

[17] *Id.*

[18] *Id.*

15

to "car thieves who could bypass the ignition lock . . . the agency decided to require a device, which would prevent either self-mobility or steering even if the ignition lock were bypassed."[19]

51.    An industry-standard engine immobilizer is an effective way to satisfy this requirement, "because it locks out the engine control module if an attempt is made to start the vehicle without the correct key or to bypass the electronic ignition system."[20] Defendants' choice not to use this industry-standard anti-theft technology or other reasonable anti-theft measures predictably led to rampant car thefts and resulted in a threat to public safety and an ongoing public nuisance.

52.    In the late 1980s and early 1990s, vehicle theft increased dramatically in the United States.[21] The most common method for stealing a car involved bypassing the motor's ignition switch, otherwise known as "hotwiring." The graph below illustrates the dramatic rise in car thefts during this time period.[22]

---

[19] Federal Motor Vehicle Safety Standards; Theft Protection, 71 Fed. Reg. 17,753 (Apr. 7, 2006), https://www.govinfo.gov/content/pkg/FR-2006-04-07/pdf/06-3358.pdf; *see also* Motor Vehicle Safety Standard No. 114; Theft Protection; Passenger Cars, 33 Fed. Reg. 83, 6,471 (Apr. 27, 1968), https://www.govinfo.gov/content/pkg/FR-1968-04-27/pdf/FR-1968-04-27.pdf#page=1.

[20] Jacqueline Glassman, *Interpretation ID: GF005229-2*, NHTSA (Sept. 24, 2004), https://www.nhtsa.gov/interpretations/gf005229-2#:~:text=This%20responds%20to%20your%20letter,114%2C%20Theft%20Protection.

[21] Anthony Dixon & Graham Farrell, *supra* note 12, at 1, 3.

[22] *Id.* at fig. 1.



**Vehicle thefts per 10,000 vehicles in operation, and vehicle theft arrests per 100,000 population, 1960-2014**

53.    In a precursor to the contemporary crisis, in the late 1980's to early 1990's, General Motors cars were stolen at elevated rates due to the relative ease with which a thief could bypass the ignition lock.[23] The ease with which those cars could be stolen spurred a trend of youths—some as young as ten years old—engaging in automobile theft and joyriding.[24]

54.    In the years that followed, General Motors, and nearly all other automotive manufacturers, adopted the anti-theft technology of passive vehicle immobilizers for cars distributed to the American market, which were patented in

---

[23] *See* Tim Farley, *Thieves Put GM Models at Top of List*, Oklahoman (Sept. 11, 1988, 12:00 AM), https://www.oklahoman.com/story/news/1988/09/11/thieves-put-gm-models-at-top-of-list/62639884007/.

[24] *See* Stephen Buckley, *D.C. Police Report Increase in Car Thefts by Youngsters,* Wash. Post (Feb. 1, 1990), https://www.washingtonpost.com/archive/politics/1990/02/01/dc-police-report-increase-in-car-thefts-by-youngsters/fa2c16c0-55a9-4866-8514-8f8e4abfdcf7/.

17

1993.[25] Unlike Evans and Birkenbeuel's invention nearly 75 years prior, the vehicle immobilizer would render the engine operable only "if the correct key having coded information is used[,]" rather than relying on concealed switches or memorizing keypad combinations.[26]

55.    In essence, the vehicle immobilizers of the 1990s worked by checking the "fingerprint" of a car key based on electronic codes the key sends to the vehicle. They prevented hotwiring by ensuring that a car would not start if the key was not present—whether or not the ignition switch was turned or bypassed.

56.    Although the mechanism behind the vehicle immobilizer was more intricate than the original 1919 invention, the overall purpose remained the same: "to make the vehicle more difficult to steal."[27]

57.    The invention proved successful and, less than five years later, the European Union mandated that all new passenger cars from 1998 onward be equipped with an electronic engine immobilizer.[28] Similar mandates soon followed in Australia, New Zealand, and Canada.

58.    As engine immobilizers became the industry standard among manufacturers, at least one study in the Netherlands suggested that immobilizers

---

[25] Int'l Patent Publication No. WO 93/13968 (filed Jan. 7, 1993).

[26] *Id.*

[27] *Id.*

[28] Commission Directive 95/56/EC, 1995 O.J. (L286) 1 (amending Council Directive 74/61/EEC to require the installation of immobilizers and alarm systems in motor vehicles beginning in October 1998).

"lowered the overall rate of car theft on average by about 50 percent during
1995-2008."[29]

59.    By 2011, studies concluded "that good quality electronic immobilizers
[have] bec[o]me car theft's killer technology" and proved to be 32.7% "more
effective in reducing car theft than alarms" and 42.2% "more effective than central
locking."[30]

60.    Equally critical, academic studies support the proposition that "[f]rom
the early 1990s onwards, it gradually became less easy for adolescents to begin
offending as an increasing proportion of vehicles became secure" because the
"young offenders did not have the skill or experience to overcome the new vehicle
security technology, particularly electronic immobilizers."[31] As the rate of young
offenders decreased due to improved vehicle security, "fewer adolescents" went on
to experience "criminal career onset and continuance."[32]

---

[29] Jan C. van Ours & Ben Vollaard, *The Engine Immobilizer: A Non-Starter for Car Thieves*, TILEC Discussion Paper No. 2013-001, SSRN, at 13 (Jan. 14, 2013),
https://deliverypdf.ssrn.com/delivery.php?ID=127087120097029119078084107081001030022041017031027078099093024106009075127118002030001121005122042126107027087095100026018070046034013064088076022067085110020010058066038090085019017108089031127069111086113121096030001027069090090007106081078030084&EXT=pdf&INDEX=TRUE.

[30] Graham Farrell et al., *The Crime Drop and the Security Hypothesis*, 48(2) J. Res. Crime & Delinq. 147, 163, 169 (2011),
https://www.researchgate.net/profile/Graham-Farrell/publication/255589010_The_Crime_Drop_and_the_Security_Hypothesis/links/54f3b8300cf299c8d9e537d9/The-Crime-Drop-and-the-Security-Hypothesis.pdf.

[31] Anthony Dixon & Graham Farrell, *supra* note 12, at 1, 7.

[32] *Id.*; *see also* Graham Farrell, *Forty years of declining burglary in the United States: Explanation and evidence relating to the security hypothesis*, 35 Sec. J.

**B.    Hyundai and Kia Deviated from the Industry Standard by Electing Not to Include Immobilizers or Other Reasonable Anti-Theft Technology in the Susceptible Vehicles**

61.    Studies by the Highway Loss Data Institute ("HLDI") showed "that vehicle theft losses decreased significantly after factory-installed passive immobilizing antitheft devices were introduced."[33] Specifically, HLDI studies between 1996 and 2013 all showed decreases in theft losses for vehicles with engine immobilizers studied in those years, including General Motors, BMW, Ford, and Nissan.[34] A 2013 HLDI study "found that thieves were sometimes targeting the older model years of a vehicle series without immobilizers, such as the Honda Civic and Honda Accord."[35]

62.    Despite decades of research and findings that immobilizers significantly reduced vehicle theft and the consequential public safety risks, "only 26 percent of Hyundai and Kia" 2015 vehicle models had "passive immobilizers as standard equipment, compared with 96 percent of other manufacturers."[36]

63.    The low percentage of Hyundai and Kia vehicles with immobilizers, or other reasonable anti-theft technology, is especially concerning given that, during

---

444, 458 (2022) https://link.springer.com/article/10.1057/s41284-021-00284-4 (arguing that "making crime more difficult to commit may be the most effective way to reduce juvenile crime and progression to adult crime").

[33] *Hyundai and Kia theft losses*, 38 HLDI Bull. 28, 1 (Dec. 2021), https://www.iihs.org/media/0e14ba17-a3c2-4375-8e66-081df9101ed2/opm7QA/HLDI%20Research/Bulletins/hldi_bulletin_38-28.pdf.

[34] *Id.* at 2.

[35] *Id.*

[36] *Id.* at 5.

this same time period, Hyundai and Kia were installing immobilizers in their models for sale in the European and Canadian markets.[37]

64.    Defendants are familiar with the benefits of installing effective anti-theft devices in the American market. They acted with full knowledge that they were making choices that would result in their vehicles being more susceptible to theft.

65.    There are two separate components to NHTSA's vehicle theft regulations—one emphasizing the supply side of the market for stolen vehicles and the other the demand side. The supply-side regulation, 49 C.F.R. § 571.114, requires automobile manufacturers to take steps intended to make it harder for would-be thieves to steal cars, which almost all automakers comply with by equipping their vehicles with engine immobilizers.

66.    The demand-side regulation, 49 CFR § 541, requires automobile manufacturers to label parts with unique identifiers to make it easier to identify parts that have been stolen from a vehicle and, thereby, reduce the demand for stolen cars and chop shops (where stolen cars are disassembled so that their valuable parts can be sold).[38] If a line of vehicles is adequately protected from theft due to the inclusion of anti-theft technology, manufacturers can apply for exemptions from this labeling

---

[37] Hyundai first began exporting its cars to parts of Europe, the United Kingdom, and Canada between 1978 and 1984. *See Over 50 years of progress: the history of Hyundai*, Hyundai Newsroom (Apr. 6, 2019), https://www.hyundai.news/eu/articles/press-releases/over-50-years-of-progress-the-history-of-hyundai.html. Similarly, Kia vehicles were introduced into European and Canadian markets in the 1990s.

[38] Requirements for passenger motor vehicles, 49 C.F.R. § 541.5 (June 1, 2011).

21

requirement. *See* 49 C.F.R. § 543. Hyundai requested an exemption from the labeling requirement for its 2008 Hyundai Azera line based on its inclusion of an immobilizer.[39] Recognizing the efficacy of the anti-theft technology in March of 2007, "[Hyundai] stated that the data shows a dramatic reduction of theft rates due to the introduction of devices substantially similar to the Kia immobilizer device."[40]

67.    Despite knowing the unquestionable benefit of engine immobilizers, until the last year or so, Hyundai and Kia offered such anti-theft devices only in a few of their more expensive models, like the Azera, and they failed to equip their other models with any reasonably effective alternative. Their decisions have compounded the harms to low-income communities.[41] Consumers without resources to afford these higher end models are more likely to live in areas with

---

[39] Petition for Exemption From the Vehicle Theft Prevention Standard; Hyundai-Kia America Technical Center, Inc., 72 Fed. Reg. 39,661, *supra* note 2; *see also* Petition for Exemption From the Vehicle Theft Prevention Standard; Hyundai-Kia America Technical Center, Inc., 75 Fed. Reg. 1,447, *supra* note 2 (NHTSA notice granting an identical exemption for the Kia Amanti vehicle line beginning in model year 2009 based on Defendant Kia's representation that the immobilizer installation for that specific model should substantially reduce theft rates).

[40] *Id.* (Hyundai cited theft rates of other car makes because there was no available theft data for its Azera line at that time. But Hyundai told NHTSA its immobilizer was functionally and operationally similar to others and cited the efficacy of those devices, such as "the Taurus, Mustang, Riviera and Toronado vehicle lines[, which] showed a 63, 70, 80, and 58 percent theft rate reduction respectively between pre- and post-introduction of immobilizer devices as standard equipment on these vehicle lines.").

[41] Tom Krisher, *Thieves key on hack that leaves Hyundai, Kia cars vulnerable*, AP News (Sept. 21, 2022, 10:21 PM), https://apnews.com/article/social-media-milwaukee-theft-ecd3be407c1b7cb725ae607b8d86bcaf (noting that "[m]any of the vulnerable Hyundais and Kias are often bought by lower-income people" because, as stated by HLDI Senior VP Matt Moore, those cars "are relatively inexpensive vehicles when purchased new").

higher crime rates and are likely less able to pay for alternative transportation or for the cost of repairing a recovered, but damaged, vehicle after a theft.

68.    In September 2022, HLDI found that Hyundais and Kias are stolen at nearly twice the rate of other vehicles in the automobile industry. Specifically, "Hyundais and Kias without immobilizers had a vehicle theft claim rate of 2.18 per 1,000 insured vehicle years" while the remainder of the industry, combined, had a theft claim rate of 1.21.[42]

69.    Defendants' decision not to install reasonable anti-theft technology in the Susceptible Vehicles between 2011 and 2022, in contrast to the vast majority of car manufacturers that did, has foreseeably led to the epidemic plaguing Plaintiff.

**C.    The Lack of Reasonable Anti-Theft Devices in Most Hyundai and Kia Vehicles Has Led to a Wave of Thefts**

70.    Kia and Hyundai chose to flout the industry standard of utilizing an engine immobilizer or other reasonable anti-theft technology in the Susceptible Vehicles, which made those vehicles more susceptible to theft. As would-be car thieves learned of this susceptibility, the incidence of theft for Susceptible Vehicles increased, relative to other models, from 2015 to 2020.[43]

---

[42] *Id.* ("An insured vehicle year is equal to one vehicle insured for one year.").

[43] *See NICB's Hot Wheels: America's 10 Most Stolen Vehicles*, NICB (Aug. 1, 2016), https://www.nicb.org/sites/files/2017-11/2015-Hot-Wheels-Report.pdf; *NICB's Hot Wheels: America's 10 Most Stolen Vehicles*, NICB (July 12, 2017), https://www.nicb.org/sites/files/2017-11/2016-Hot-Wheels-Report.pdf; *2017 Hot Wheels Report*, NICB (Sept. 18, 2018), https://www.nicb.org/news/news-releases/2017-hot-wheels-report; *NICB's Hot Wheels: America's 10 Most Stolen Vehicles*, NICB (Nov. 19, 2019), https://www.nicb.org/sites/files/2020-01/2018%20Hot%20Wheels%20Report.pdf; *NICB's Hot Wheels: America's Top Ten Most Stolen Vehicle Makes*, NICB (Oct. 13, 2020),

71.    However, this progression became an explosion in late 2020, when a group of teenagers began posting "how-to" videos detailing how simple it was to steal Susceptible Vehicles.[44] That group, the "Kia Boyz," became notorious for posting videos of youth engaging in reckless driving after stealing Kias and Hyundais.[45] As the videos detailed, a thief need only break a window, remove the plastic cowl under the steering column, and use a USB connector (such as the ubiquitous mobile phone charging cable) to turn the ignition switch and start these unsecure cars. In many instances, thieves are able to break into the Susceptible Vehicles and drive away in under one minute.

72.    What followed the trending documentation of the unsecure Susceptible Vehicles was all too predictable: thefts of Kias and Hyundais skyrocketed.[46] In the first half of 2021, the number of stolen Kias and Hyundais in Milwaukee increased by more than thirty and fifteen times, respectively, when compared to the same

---

https://www.nicb.org/HotWheels2019; and *NICB Releases Annual 'Hot Wheels' Report: America's Top Ten Most Stolen Vehicles*, NICB (Oct. 12, 2021), https://www.nicb.org/news/news-releases/nicb-releases-annual-hot-wheels-report-americas-top-ten-most-stolen-vehicles.

[44] Greg Rosalsky, *Someone stole my truck. I got a crash course on the wild black market for stolen cars*, NPR (Aug. 23, 2022, 6:30 AM), https://www.npr.org/sections/money/2022/08/23/1118457271/someone-stole-my-truck-i-got-a-crash-course-on-the-wild-black-market-for-stolen-.

[45] Chris DiLella & Andrea Day, *TikTok challenge spurs rise in thefts of Kia, Hyundai cars*, CNBC (Sept. 9, 2022, 9:11 PM), https://www.cnbc.com/2022/09/08/tiktok-challenge-spurs-rise-in-thefts-of-kia-hyundai-cars.html.

[46] *Videos Show Teens How to Steal Certain Kias and Hyundais With Only a USB Cable, Police Warn Amid Rising Thefts*, Inside Edition (Aug. 10, 2022, 1:51 PM), https://www.insideedition.com/videos-show-teens-how-to-steal-certain-kias-and-hyundais-with-only-a-usb-cable-police-warn-amid.

24

period in 2020.[47] This dramatic increase in thefts is unique to Kias and Hyundais, which represented 67% of all cars stolen in that period, compared to only 6% of stolen cars in 2019.[48] This trend then spread nationwide.

### D. Car Thefts Imperil Public Safety

73. Car thefts directly imperil public safety. By creating, facilitating, and/or otherwise contributing to a rash of car thefts, Defendants are responsible for a substantial risk to the public safety.

74. NHTSA promulgated FMVSS 114 to reduce the instances of car theft, because "stolen cars constitute a major hazard to life and limb on the highways."[49] NHTSA concluded that the "evidence shows that cars operated by unauthorized persons are far more likely to cause unreasonable risk of accident, personal injury, and death than those which are driven by authorized individuals."[50] The NHTSA Administrator concluded that "a reduction in the incidence of auto theft would make a substantial contribution to motor vehicle safety," by reducing both injuries and deaths to would-be car thieves, and by "protect[ing] the many innocent members of the public who are killed and injured by stolen cars each year."[51]

---

[47] Sean Tucker, *Milwaukee Police Report Hyundais, Kias Stolen in Record Numbers*, Kelley Blue Book (Dec. 14, 2021, 5:27 PM), https://www.kbb.com/car-news/milwaukee-police-report-hyundais-kias-stolen-in-record-numbers/.

[48] Matt Posky, *Summer of Theft Creating Bad Publicity for Hyundai, Kia*, Truth About Cars (Sept. 20, 2022 2:36 PM), https://www.thetruthaboutcars.com/cars/kia/summer-of-theft-creating-bad-publicity-for-hyundai-kia-44496971.

[49] *See* Motor Vehicle Safety Standard No. 114; Theft Protection; Passenger Cars, 33 Fed. Reg. 6,471, *supra* note 16.

[50] *Id.*

[51] *Id.*

75.     The reverse is true as well. An *increase* in the incidence of automobile theft results in a substantial decrease in public safety. Defendants' decision not to equip their vehicles with reasonable anti-theft technology, such as an immobilizer, has led to a clear rise in automobile thefts and the concomitant threats to public safety. Stolen cars are often driven recklessly—particularly in this case, where cars are stolen for joyriding or use in the commission of other crimes, rather than for parts or resale—which poses a risk to both the operators of the stolen vehicle and any lawful drivers or pedestrians who are unfortunate enough to cross their paths.

76.     By creating a rash of car thefts, Defendants are responsible for a substantial risk to public safety.

77.     Reckless driving impacts the comfortable enjoyment of life, health, and safety of others. Distinct from many instances of car theft, where the object is converting the stolen vehicle (either whole or in parts), the recent wave of Hyundai and Kia thefts often involves teenagers joyriding, posting videos of themselves driving recklessly, and then abandoning the stolen vehicles—often after collisions—at all hours of the day and night.

78.     Social media platforms are rife with examples of this dangerous conduct. Videos posted on these platforms highlight the very real dangers of this phenomenon, including youth joyriding through school zones or through crowds of bystanders, and drivers hitting other cars and then running from the scene.[52] The

---

[52] *See, e.g.*, @mixtapetrappers_, Instagram (Oct. 19, 2021), https://www.instagram.com/p/CVNhjg9D64B/?utm%20medium=copy%20link; @414hypehouse, Instagram (Aug. 19, 2021), https://www.instagram.com/p/CSwsnhfAktd/; @414hypehouse, Instagram (Sept.

fact that many of the perpetrators are juveniles and therefore inexperienced drivers—in many cases, too young to have a driver's license or permit—adds to the danger.

79.    Police officers responding to vehicle thefts and other crimes stemming from those same thefts also face serious safety threats. In Cleveland, officers have been shot,[53] shot at,[54] and stabbed[55] when responding to and/or encountering a Hyundai or Kia theft incident. In Tonawanda, a police officer stopped a driver in a stolen Kia Sportage SUV and was dragged and "thrown onto the road" when the

---

10, 2021), https://www.instagram.com/p/CTqCaYTANaC/; @414hypehouse, Instagram (Oct. 20, 2021), https://www.instagram.com/p/CVRCcU5AkwT/.

[53] Julia Bingel, *Cleveland police issue warrant for 17-year-old boy accused of shooting officer (body camera video)*, 19 News (Mar. 30, 2023, 8:51 AM), https://www.cleveland19.com/2023/03/30/cleveland-police-issue-warrant-17-year-old-male-accused-shooting-officer/.

[54] Ed Gallek & Peggy Gallek, *Thieves getting bolder: Police threatened, taunted, and shot by suspects in stolen KIAs*, Fox 8 (Mar. 20, 2023, 4:52 PM), https://fox8.com/news/i-team/thieves-getting-bolder-police-threatened-taunted-and-shot-by-suspects-in-stolen-kias/.

[55] Ed Gallek & Peggy Gallek, *Cleveland police officer stabbed in head with screwdriver*, Fox 8 (June 12, 2023, 2:12 PM), https://fox8.com/news/cleveland-police-officer-stabbed-in-head-with-screwdriver/; *see also* John H. Tucker, *Suspect charged in screwdriver assault on off-duty Cleveland police officer*, Cleveland.com (June 15, 2023, 4:34 PM), https://www.cleveland.com/crime/2023/06/suspect-charged-in-screwdriver-assault-on-off-duty-cleveland-police-officer.html.

driver of the stolen Kia attempted to flee.[56] The officer was badly injured and subsequently hospitalized.[57]

80.    A substantial risk to public safety also arises in the event that the would-be thief is confronted in the act. In January 2023, a Cleveland man followed a Hyundai Sonata that struck his car mirror and did not stop. The driver and passenger of the Hyundai got out of the vehicle with guns and began shooting at him.[58] Police found nine bullet casings in the street and bullet holes in the front window of a nearby home and in a car parked on the street.[59] About one hour later, the same Hyundai, which had been reported stolen days earlier, was involved in a drive-by shooting.[60]

81.    This risk was also tragically demonstrated in Columbus, Ohio, when a 4-year-old was killed in a hit-and-run involving a stolen Kia.[61]

---

[56] Stephen T. Watson, *Tonawanda officer badly injured when dragged by stolen vehicle is released from ECMC*, Buffalo News (June 5, 2023), https://buffalonews.com/news/local/crime-and-courts/tonawanda-officer-badly-injured-when-dragged-by-stolen-vehicle-is-released-from-ecmc/article_4768ae48-03d4-11ee-8593-4322704cd734.html#tracking-source=article-related-bottom.

[57] *Id.*

[58] Cory Shaffer, *Teens lodge stolen Hyundai in Burger King drive-thru on two wheels after owner confronts them*, Cleveland.com (Feb. 3, 2023, 5:03 PM), https://www.cleveland.com/court-justice/2023/02/teens-lodge-stolen-hyundai-in-burger-king-drive-thru-on-two-wheels-after-owner-confronts-them.html.

[59] *Id.*

[60] *Id.*

[61] Carly D'Eon, *Man wanted in fatal hit-and-run of 4-year-old boy turns himself in*, 10 WBNS (July 24, 2023, 6:04 AM), https://www.10tv.com/article/news/local/arrest-warrant-issued-for-man-allegedly-connected-to-fatal-hit-skip-south-franklinton/530-a8ab887d-8c43-48ea-8b4d-91ed5531a351.

28

82.     Car thefts and reckless driving also create a substantial risk of physical harm to pedestrian bystanders. On February 8, 2023, a stolen Hyundai involved in a high-speed chase in Baltimore crashed into another car and a 54-year-old pedestrian.[62] Both cars careened into a nearby building, which collapsed on top of the vehicles and the pedestrian.[63] The pedestrian was pronounced dead at the scene, and five occupants of the two cars were injured.[64]



E.     **Car Thefts Drain Public Resources and Frustrate Public Policy**

83.     Plaintiff has expended significant time and resources responding to this public nuisance.

---

[62] Dan Belson, *Footage shows fatal crash into Baltimore building, collapse following police pursuit of stolen car*, Balt. Sun (Mar 2, 2023, 8:29 PM), https://www.baltimoresun.com/news/crime/bs-md-ci-cr-oag-crash-collapse-footage-20230303-rbd6j3tokfhkjduh3oktmo6ow4-story.html [https://perma.cc/6UHA-S9GT].
[63] *Id.*
[64] *Id.*

29

84.    Additionally, the police and emergency resources Plaintiff has been forced to divert to respond to these thefts leaves fewer resources for combatting other crimes and enhancing community safety.[65]

85.    As a result of the skyrocketing rates of theft of Hyundai and Kia vehicles nationwide, some insurance companies are refusing to write policies for certain Hyundai and Kia models in certain locales, thereby increasing the potential number of uninsured motorists on the road.[66]

---

[65] John Roman et al., *Cost-Benefit Analysis for Crime Prevention: Opportunity Costs, Routine Savings and Crime Externalities*, 14 Crime Prevention Stud. 53–92 (Jan. 2002), https://www.researchgate.net/publication/28575336_Cost-Benefit_Analysis_for_Crime_Prevention_Opportunity_Costs_Routine_Savings_and_Crime_Externalities.

[66] Peter Valdes-Dapena, *Some auto insurers are refusing to cover certain Hyundai and Kia models*, CNN (Jan. 28, 2023, 3:06 PM), https://www.cnn.com/2023/01/27/business/progressive-state-farm-hyundai-kia/index.html; *see also* Robert Higgs, *Progressive, State Farm halt new car insurance policies for high theft models of Kia and Hyundai*, Cleveland.com (Jan. 31, 2023, 1:06 PM), https://www.cleveland.com/business/2023/01/progressive-state-farm-halt-new-car-insurance-policies-for-high-theft-models-of-kia-and-hyundai.html; *see also* Joe Hernandez, *Dealers still sell Hyundais and Kias vulnerable to theft, but insurance is hard to get*, NPR (May 4, 2023, 5:00 AM), https://www.npr.org/2023/05/04/1173048646/hyundai-kia-car-theft-tiktok-insurance-dealerships (discussing how "a dozen" insurance companies denied coverage for the new owner of 2020 Kia Forte).

## V.    THE CONTINUING PUBLIC NUISANCE AND DEFENDANTS' LATE, INSUFFICIENT RESPONSE

86.    The rampant thefts of Hyundai and Kia vehicles are still impacting counties and municipalities nationwide, including Plaintiff, years after the rise in thefts of the Susceptible Vehicles first began.[67]

87.    Data from the Council on Criminal Justice shows that between 2019 and 2023 motor vehicle theft has increased an average of 104% across 30 cities in the United States.[68]

88.    Defendants' responses to the crises that they have created show they continue to prioritize profits over safety. Defendants have refused to implement a recall to install reasonable anti-theft technology in the Susceptible Vehicles, initially only suggesting that owners of Susceptible Vehicles use wheel locks and, for some government entities, offering wheel locks for them to distribute.[69] Unfortunately, the wheel locks are not entirely effective; Susceptible Vehicles with wheel locks in use have still been stolen and, in some instances, used in connection

---

[67] Tom Krisher, *Hyundai and Kia thefts keep rising despite security fix*, AP News (May 9, 2023, 7:40 AM), https://apnews.com/article/hyundai-kia-tiktok-theft-stolen-8e0a353d24be0e7bce36e34c5e4dac51.

[68] Ernesto Lopez et al., *Crime Trends in U.S. Cities: Mid-Year 2023 Update*, Council Crim. Just. (July 2023), https://counciloncj.org/mid-year-2023-crime-trends/.

[69] Elliot Hughes, *Kia, Hyundai will make security feature standard on new vehicles and distribute free steering wheel locks after surge of thefts*, Milwaukee J. Sentinel (July 20, 2021, 11:20 AM), https://www.jsonline.com/story/news/crime/2021/07/19/kia-hyundai-handing-out-free-steering-wheel-locks-through-end-year/7963950002/.

with other crimes, including shootings.[70] In addition, government entities are not set up to distribute automotive parts to residents.

89.    More recently, Hyundai and Kia have begun rolling out a "software update" rather than installing immobilizers or other reasonable anti-theft technology.[71] As highlighted in the multistate letter sent on behalf of 18 Attorneys General, Hyundai acknowledged that some of the affected vehicles cannot be updated, and Kia "confirmed that some unspecified number of affected vehicles cannot receive the updates."[72]

---

[70] Ashley Sears, *Milwaukee woman's Kia stolen twice, had steering wheel lock*, FOX 6 News Milwaukee (Sept. 28, 2021, 8:59 PM), https://www.fox6now.com/news/milwaukee-womans-kia-stolen-twice; *see also* David Rose, *'B****, I swear, b****, I'm gonna crack your phone:' Drive-by shooting suspect says to Tacoma woman*, FOX 13 Seattle (Jan. 25, 2023, 3:01 PM), https://www.q13fox.com/news/b-i-swear-b-im-gonna-crack-your-phone-drive-by-shooting-suspect-says-to-tacoma-woman; and *Boy, 15, fighting for his life after shooting involving stolen Kia in Minneapolis*, CBS News Minnesota (Apr. 6, 2023), https://www.cbsnews.com/minnesota/video/boy-15-fighting-for-his-life-after-shooting-involving-stolen-kia-in-minneapolis/.

[71] *Hyundai and Kia Launch Service Campaign to Prevent Theft of Millions of Vehicles Targeted by Social Media Challenge*, NHTSA (Feb. 14, 2023), https://www.nhtsa.gov/press-releases/hyundai-kia-campaign-prevent-vehicle-theft.

[72] Letter from Attorneys General to Ann Carlson, Acting Administrator of the National Highway Traffic Safety Administration ("Letter from Attorneys General to NHTSA") at 6 (Apr. 20, 2023), https://oag.dc.gov/sites/default/files/2023-04/AG%20Multistate%20Letter%20to%20NHTSA%204.20.2023%20%281%29.pdf.

90.     As acknowledged in the motion for preliminary approval of the class action settlement in the instant litigation, only 6.9 million of the approximately *9 million* Susceptible Vehicles are even eligible for the update.[73]

91.     In the three months immediately following Kia's and Hyundai's release of the software update, data gathered from the Associated Press showed "that the number of Hyundai and Kia thefts is still growing[.]"[74] The software update has not stopped the nuisance that the Susceptible Vehicles created and the expenses that Plaintiff has incurred and continues to incur.

92.     The update's efficacy has not been proven in the real world. There have been numerous reports of Kia and Hyundai vehicles being stolen after receiving the software update, and Kia and Hyundai have identified scenarios where the software logic fails.[75]

93.     In addition, there appears to be a different theft method emerging to defeat the software update. To avoid publicizing that method, Plaintiff will not

---

[73] Consumer Class Pls.' Notice Mot. & Renewed Mot. Prelim. Approval Class Action Settlement at 15, *In Re: Kia Hyundai Vehicle Theft Marketing, Sales Practices, and Products Liability Litigation*, 8:22-ml-03052-JVS-KES (C.D. Cal. Sept. 27, 2023), Dkt. No. 228; *see also* Carly Schaffner, *Kia, Hyundai anti-theft software fixes a work in progress*, Auto. News (June 2, 2023, 8:00 AM), https://www.autonews.com/regulation-safety/kia-hyundai-antitheft-software-fix-needs-fixes [https://perma.cc/HGH7-ZHZF] (noting that Defendants estimate "there are 9 million affected vehicles between them on the road").

[74] *See* Tom Krisher, *Hyundai and Kia thefts keep rising despite security fix*, *supra* note 67.

[75] Carly Shaffner, *Kia, Hyundai anti-theft software fixes a work in progress*, *supra* note 73 (discussing a February 2023 service bulletin issued from Kia to its dealers regarding a software compatibility issue for Kia vehicles equipped with remote start accessories; another bulletin issued from Kia in late-May of 2023 acknowledged that "the problem has not been remedied").

detail it in this public filing, but it appears to circumvent or defeat the software update "fix" through simple physical means that do not require sophisticated tools, but which, on information and belief, would not defeat an immobilizer or other reasonable anti-theft technology.

94.    For vehicles not covered by the update, Defendants are offering nothing more than steering wheel locks or rebates for already purchased wheel locks.[76] As noted by multiple Attorneys General, steering wheel locks "still would not correct the underlying safety flaw . . . and . . . would impermissibly shift the responsibility for fixing this problem from the company to individual vehicle owners[.]"[77]

95.    In addition, upon information and belief, the software update can significantly inconvenience the drivers of the Susceptible Vehicles, making them less likely to seek it out and use it. Rather than install an actual immobilizer or other reasonable anti-theft technology, the software update merely doubles the length of the vehicles' theft alarm sound and adds a new logic check to the vehicles' onboard computers that is intended to prevent the Engine Control Unit from allowing the engine to start and run if the key fob is not used to unlock the doors. This update will interfere with the usability of the Susceptible Vehicles in many everyday situations, making drivers less likely to use it if they get the update at all.

---

[76] *See* Zac Palmer, *Hyundai launches software update to fix some of 4 million vehicles at risk of theft*, Yahoo! (Feb. 14, 2023), https://autos.yahoo.com/hyundai-launches-software-fix-4-155800221.html.

[77] Letter from Attorneys General to NHTSA at 6.

96.    As noted by the Attorneys General in their letter dated April 20, 2023, there are at least two other significant issues with the software update. First, "not all eligible vehicles can receive the updates immediately"—approximately two million vehicles with the "starting system flaw" are still awaiting eligibility for the update.[78] Meanwhile, these vehicles "will remain on the road, vulnerable to theft and posing a threat to public safety."[79] Second, Defendants' "voluntary service campaign" does not prompt certain "regulatory requirements and oversight and instead places additional burdens on individual vehicle owners."[80]

97.    Owners of the Susceptible Vehicles have already experienced issues where the software update—which requires the car to be unlocked using the fob before starting, or else the alarm will sound—conflicts with after-market remote start systems that they had installed, rendering the vehicles functionally inoperable. As one owner recently posted: "I have the update. I also have an after market remote start. The remote start will set off my car alarm. You can turn the alarm off, but it will beep periodically and the headlights flash until you turn the vehicle off."[81]

---

[78] *Id.* at 6–7. Additionally, media outlets report that customers are "having a difficult time getting through" to customer service representatives for Hyundai and Kia to inquire about the software update and their vehicle's eligibility. *See Hyundai, Kia owners frustrated by customer call center wait times to get security upgrade*, WHIO TV 7 (Feb. 16, 2023, 8:47 PM), https://www.whio.com/news/crime-and-law/hyundai-kia-owners-frustrated-by-customer-call-center-wait-times-get-security-update/SXRBN3OTHVC37OLC3735Y755ZU/.

[79] Letter from Attorneys General to NHTSA at 7.

[80] *Id.*

[81] Reddit (Feb. 15, 2023, 7:05 AM), [https://web.archive.org/web/20230311080407/https://www.reddit.com/r/kia/comments/11303m4/hyundai_and_kia_release_software_update_to/?sort=new].

98.    There can be no doubt that communities nationwide are suffering harmful downstream consequences because of business decisions Hyundai and Kia made not to include reasonable anti-theft technology, such as an engine immobilizer, in the Susceptible Vehicles. And as local governments have experienced nationwide when vaping products and drugs have unleashed widespread harms affecting public health and safety, local communities are left paying the price for businesses' decisions to boost their profits.

99.    Prior to this software update, Hyundai turned this crisis of its own making into a source of revenue, selling security kits for $170, plus the cost of installation.[82] Defendants could have, and should have, initially included a fob-integrated engine immobilizer, or other reasonable anti-theft technology, consistent with the industry standard. According to the Netherlands Institute for Certification of Vehicle Security Systems, the additional manufacturing costs related to installing adequate anti-theft devices in 2011 would have been at most €50 per car, approximately $70.[83] Even after the cars were sold, Defendants could have implemented a mandatory recall. Instead, Hyundai chose to make money from a crime wave it caused.

100.    Because Hyundai and Kia have not implemented a mandatory recall for the installation of immobilizers or other reasonable anti-theft technology,

---

[82] Taryn Phaneuf, *Own a Kia or Hyundai? Here's Why Your Insurance Rates Could Go Up*, Nerd Wallet (Jan. 26, 2023, 1:31 PM), https://www.nerdwallet.com/article/insurance/kia-hyundai-theft.
[83] Jan C. van Ours & Ben Vollaard, *supra* note 29 at 13.

millions of the Susceptible Vehicles remain on the road. A recent report from CARFAX found that 4.9 million Hyundais and Kias remain susceptible to theft.[84]

101. By failing to equip their vehicles with reasonable anti-theft technology, such as an engine immobilizer, Defendants have elected profits over safety and created a public nuisance that continues to this day.

## VI.    IMPACTS ON PLAINTIFF

102. Durham has experienced skyrocketing rates of Hyundai and Kia vehicle thefts. In 2023, 681 Hyundai and Kia vehicles were stolen—a 632% increase from the 93 Hyundai and Kia thefts in 2022 and, a *1,235%* increase over the 51 Hyundai and Kia thefts in 2021.



---

[84] Patrick Olsen, *Nearly 5 Million Hyundai and Kia Models Need Anti-Theft Repairs*, CARFAX Blog (July 19, 2023), https://www.carfax.com/blog/kia-hyundai-theft-repairs.

103.    Between 2020 and 2022, Hyundais and Kias accounted for approximately 9.4% of all vehicle thefts in Durham. For 2023, that number grew to an average of approximately 39%.



104.    At the same time, attempted thefts of Hyundais and Kias rose from 19 in 2022 to 472 in 2023—a *2,384%* increase.  The attempted Hyundai and Kia thefts in 2023 more than doubled the attempted thefts of every other car make *combined*.

105.    The high rate of thefts has also led to increased threats to public safety.

106.    Over the past few years, Durham police officers have responded to multiple shootings that involved stolen Hyundai or Kia vehicles.

107.    In December 2021, a 17-year-old driver and six other passengers in a stolen Hyundai Santa Fe crashed the car into a utility pole following a high-speed

chase with another car.[85] An individual in the other car shot at the occupants of the stolen Hyundai, killing two teenagers and injuring four others. The shooting took place two blocks from an elementary school.

108.    In August 2023, a stolen Kia Forte was involved in a drive-by shooting that ended with the Kia crashing into a utility pole. Three individuals suffered gunshot wounds and bullets struck the homes of five other individuals.

109.    In February 2024, Durham police responded to the scene of a motor vehicle collision involving a stolen Kia Sportage, which had crashed into a parked car. Prior to the crash, occupants of the stolen Kia shot at and struck a pedestrian near the scene.

110.    And in May 2024, officers responded to an apartment complex where suspects in a blue Kia Rio shot at and struck a woman in the back. Bullets from the shooting also struck nearby residences and other vehicles.

111.    Stolen Hyundai and Kia vehicles have also been linked to burglaries and robberies in Durham.

112.    For example, in November 2023, five armed individuals burglarized a store before using a stolen Hyundai from Durham as a get-away vehicle.[86] They later abandoned the car in Durham.[87]

---

[85] Virginia Bridges, *Prosecutor offers motive in deadly NC shooting that killed 2, injured 4 youths*, News & Observer (June 15, 2022, 1:03 PM), https://www.newsobserver.com/news/local/crime/article262452692.html [https://perma.cc/J4UV-7HNK].

[86] *DCSO Deputies Recover Stolen Vehicles, Drugs, and Weapons*, Durham Cnty. NC News (Dec. 4, 2023, 3:45 PM), https://www.dconc.gov/Home/Components/News/News/9901/.

[87] *Id.*

113. In April 2024, a stolen Kia Optima was involved in multiple armed robberies, shootings, and carjackings over a two-week period. The crime spree came to an end on April 13, 2024, when the Kia crashed into a fire hydrant. Multiple individuals fled the vehicle, and one juvenile suspect was apprehended by police. Police also recovered two guns from the scene.

114. And on June 16, 2024, a stolen Hyundai Elantra was linked to the theft of a Kia Optima. Later that day, two masked suspects used a Kia Optima in a robbery of five individuals near a food truck.

## VII.   CAUSES OF ACTION

## COUNT ONE — PUBLIC NUISANCE

115. Plaintiff incorporates each preceding paragraph as though fully set forth herein, and further alleges as follows.

116. Defendants created and maintained a public nuisance under North Carolina law, which proximately caused injury to Plaintiff.

117. Plaintiff brings an action under both common law and statutory authority for abatement of that nuisance. *See* N.C. Gen. Stat. § 160A-193 (granting Durham the authority to abate public nuisances within its boundaries that are dangerous or prejudicial to public safety).

118. Plaintiff and the residents of its community have a common right to be free from conduct that creates an unreasonable jeopardy to the public health, welfare and safety, and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property.

40

119.    Defendants intentionally and recklessly designed, manufactured, distributed, and sold vehicles that Defendants knew, or reasonably should have known, are dangerously susceptible to theft in Plaintiff's community, resulting in elevated levels of crime, death and injuries to the residents of Plaintiff's community, a higher level of fear, discomfort and inconvenience to residents of Plaintiff's community, and direct costs to Plaintiff.

120.    Defendants, through their designing, manufacturing, distribution, and sale of automobiles that are dangerously susceptible to theft, have created, contributed to, and maintained a public nuisance that substantially interferes with rights common to the general public, is offensive to community moral standards, and unlawfully obstructs the public's free use of public property.

121.    Defendants' conduct has caused a significant and unreasonable interference, and continues to interfere, with the use by the public of public streets and sidewalks in Durham, and has endangered the safety, health, welfare, peace, comfort, and convenience of the general public in Durham the ability to be free from disturbance and reasonable apprehension of danger to person or property.

122.    Defendants' interference with the public rights maintained by Durham is unreasonable because there is little social utility to Defendants' decisions to forgo reasonable anti-theft technology, and any potential value is outweighed by the gravity of the harm inflicted by Defendants' actions.

123.    Defendants knew, or reasonably should have known, that their conduct would have an ongoing detrimental effect upon the public health, safety and

welfare, and the public's ability to be free from disturbance and reasonable apprehension of danger to person and property.

124.   The public nuisance created and maintained by Defendants has resulted, and continues to result, in significant damage and annoyance to Durham.

125.   In addition, Defendants' conduct has undermined law enforcement efforts to deter vehicle theft and has otherwise diverted limited law enforcement resources.

126.   At all relevant times, Defendants have been the designers, manufacturers, marketers, and/or distributors of the Susceptible Vehicles being stolen at record rates that are, at times, being used in the commission of violent crimes in the State of North Carolina and Durham.

127.   At all times relevant to this litigation, Defendants knew or had reason to know of the hazards and dangers of forgoing installation of engine immobilizers or other reasonable anti-theft technology in the Susceptible Vehicles and specifically the increased risk of vehicle theft and public harm. Defendants knew or had reason to know that the installation of engine immobilizers successfully decreased the rate of car theft by as much as 40%. Defendants also knew or had reason to know that the installation of immobilizers or other reasonable anti-theft technology in their own vehicles has considerable deterrent effects on the rate of car theft.

128.   Defendants know that their conduct has caused an increase in vehicle theft that has had and will continue to have a detrimental effect on the safety, welfare, peace, comfort, and convenience of the general public in Durham.

129.    Defendants were a substantial factor in vehicle theft becoming so widespread in Durham. Because of Defendants' special position as a designer, manufacturer, and/or distributer of the Susceptible Vehicles, rampant theft of the Susceptible Vehicles would not have become so widespread, and the subsequent threat to public safety that now exists would have been averted.

130.    Defendants, through their business practices, contribute to a significant increase in vehicle theft, reckless driving, and the use of their vehicles in the commission of other crimes in Durham, thus endangering the safety and health of considerable numbers of Durham residents, depriving Durham residents of the peaceful use of the public streets and sidewalks, undermining law enforcement efforts, increasing law enforcement costs and diverting law enforcement resources, and interfering with commerce, travel, and the quality of daily life in Durham.

131.    The presence of Defendants' Susceptible Vehicles in Plaintiff's community, and the consequences of Susceptible Vehicles being stolen in Plaintiff's community, proximately results in significant costs to Plaintiff in order to enforce the law, equip its police officers and medical services or first responders, and provide other services.

132.    Accordingly, each Defendant has and continues to substantially interfere with rights common to all and cause, contribute to, and/or maintain a public nuisance in Durham.

133.    Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions have

43

a great probability of causing substantial harm and did in fact cause substantial harm.

134.   As a result of Defendants' conduct, Durham has suffered and will continue to suffer economic damages, including significant expenditures for police, emergency, health, prosecutions, corrections, youth rehabilitation, and other services. Durham will continue to incur economic damages until the nuisance is abated.

135.   Defendants' misconduct alleged in this case has created an ongoing and persistent public nuisance and does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur and is not part of the normal and expected costs of a local government's existence. Durham alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect to occur.

136.   Durham has suffered, and will continue to suffer, unique harms as described above, which are different in kind and degree to the harms suffered by North Carolina citizens at large.

137.   Durham has incurred, and will continue to incur, expenditures over and above its ordinary public services due to the public nuisance created by Defendants' actions.

138.   Durham requests an order providing for abatement of the public nuisance that Defendants have created or assisted in the creation of, compensation for the economic injuries suffered as a result of the nuisance, injunctive relief, and all legal and equitable relief allowed by law.

139.   Durham does not seek damages for the wrongful death, physical personal injury, serious emotional distress, or any physical damage to property caused by Defendants' actions.

## COUNT TWO — NEGLIGENCE

140.   Durham incorporates each preceding paragraph as though set forth fully herein.

141.   At all times relevant to this litigation, Defendants had a duty to act as a reasonably careful person would act under the circumstances in the design, research, development, manufacture, testing, and distribution of Defendants' products to North Carolina and the Durham community.

142.   Additionally, at all times relevant to this litigation, Defendants had a duty to take all reasonable steps necessary to prevent the manufacture, distribution, and/or sale of a product that was so easy to steal.

143.   The existence of a duty depends on the foreseeability of the injury. Each Defendant owed a duty to Plaintiff because the injuries alleged herein were and are foreseeable, and in fact foreseen, by Defendants.

144.   Defendants owed and continue to owe Durham a duty not to expose Durham to an unreasonable risk of harm.

145.   Defendants' duties were preexisting.

146.   At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of forgoing installation of engine immobilizers or other reasonable anti-theft

45

technology in the Susceptible Vehicles and specifically, the increased risk of vehicle theft and public harm.

147.  Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that the omission of an engine immobilizer or other reasonable anti-theft technology in the Susceptible Vehicles could cause Durham's injuries and thus created a dangerous and unreasonable risk of injury to Durham. Defendants were therefore in the best position to protect Durham against the foreseeable rise in the theft of Susceptible Vehicles.

148.  As such, Defendants, by action and inaction, breached their duty and failed to exercise reasonable care, and failed to act as a reasonably prudent person and/or company would act under the same circumstances in the design, research, development, manufacture, testing, and distribution of their vehicles, in that Defendants manufactured and distributed vehicles that fell below minimum, industry-standard security measures.

149.  Defendants are in control of the design, research, development, manufacture, testing, and distribution of the vehicles they distributed to authorized dealerships in Durham.

150.  It was foreseeable that Durham would suffer injuries as a result of Defendants' failure to exercise reasonable care in the design, research, development, manufacture, testing, and distribution of Defendants' vehicles, particularly given Defendants' recognition as early as 2007 that engine immobilizers were an effective deterrent in preventing vehicle theft.

151.   Defendants were negligent in failing to guard against third-party misconduct and enabled such misconduct.

152.   Defendants acted unreasonably in light of the foreseeable result of their conduct, and Defendants' negligence helped to and did produce, and was a factual and proximate cause, of the injuries, harm, and economic injuries that Durham suffered and will continue to suffer.

153.   Defendants' acts and omissions imposed an unreasonable risk of harm to others separately and/or combined with the negligent and/or criminal acts of third parties.

154.   Durham's injuries, harms, and economic injuries would not have occurred absent Defendants' negligent conduct as described herein.

155.   As a proximate result of Defendants' wrongful acts and omissions, Durham has been injured and suffered economic damages and will continue to incur expenses in the future, as described herein, including but not limited to expending, diverting, and increasing resources to investigate thefts of the Susceptible Vehicles, retrieve Susceptible Vehicles that have been stolen, and/or address property damage on public roads within Durham due to the theft of Susceptible Vehicles.

156.   Defendants engaged in conduct, as described above, that constitutes willful, wanton, and reckless disregard for the safety and health of Durham's residents, being fully aware of the probable dangerous consequences of the conduct and deliberately failing to avoid those consequences.

157.   Defendants' conduct constituting willful, wanton, reckless, and conscious disregard for public safety was committed and/or authorized by one or

more officers, directors, or managing agents of Defendants, who acted on behalf of Defendants. Additionally, or in the alternative, one or more officers, directors or managing agents of Defendants knew of the conduct constituting willful, wanton, and reckless disregard for public safety and adopted or approved that conduct after it occurred.

158.    Defendants' willful, wanton, knowing, and reckless disregard of Durham's rights, including the right to public safety, therefore warrants an award of aggravated or punitive damages. Additionally, Defendants' willful, wanton, and reckless conduct in failing to follow industry standards also justifies an award of punitive damages.

159.    Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur and is not part of the normal and expected costs of a local government's existence. Durham alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect to occur.

160.    Durham has incurred, and will continue to incur, expenditures over and above its ordinary public services due to the negligence caused by Defendants' actions.

161.    The tortious conduct of each Defendant was a substantial factor in producing harm to Durham.

162.    Durham is without fault, and injuries to Durham and its residents would not have occurred in the ordinary course of events had Defendants used due

care commensurate to the dangers involved in the manufacturing and distribution of their vehicles.

163.    Durham does not seek damages for the wrongful death, physical personal injury, serious emotional distress, or any physical damage to property caused by Defendants' actions.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment:

164.    Entering an Order that the conduct alleged herein constitutes a public nuisance under North Carolina law;

165.    Entering an Order that Defendants are jointly and severally liable;

166.    Entering an Order requiring Defendants to abate the public nuisance described herein and to deter and/or prevent the resumption of such nuisance;

167.    Enjoining Defendants from engaging in further actions causing or contributing to the public nuisance as described herein;

168.    Awarding Plaintiff equitable relief to fund automobile theft prevention;

169.    Awarding Plaintiff actual and compensatory damages;

170.    Awarding Plaintiff punitive damages;

171.    Awarding Plaintiff reasonable attorneys' fees and costs of suit;

172.    Awarding pre-judgment and post-judgment interest; and

173.    Awarding Plaintiff with such other and further relief as the Court deems just and proper under the circumstances.

## IX.    DEMAND FOR JURY TRIAL

174.   Plaintiff hereby demands a trial by jury.

RESPECTFULLY SUBMITTED this 31ST DAY OF JULY, 2024.

KELLER ROHRBACK L.L.P.

By */s/ Dean Kawamoto*
Dean Kawamoto, CSB #232032
Gretchen Freeman Cappio (*pro hac vice forthcoming*)
Ryan McDevitt (*pro hac vice forthcoming*)
Garrett Heilman (*pro hac vice forthcoming*)
Zachary Gussin (*pro hac vice forthcoming*)
Kylie Fisher (*pro hac vice forthcoming*)
1201 Third Avenue, Suite 3400
Seattle, WA 98101
Telephone: (206) 623-1900
Fax: (206) 623-3384
dkawamoto@kellerrohrback.com
gcappio@kellerrohrback.com
rmcdevitt@kellerrohrback.com
gheilman@kellerrohrback.com
zgussin@kellerrohrback.com
kfisher@kellerrohrback.com

*Counsel for Plaintiff City of Durham, North Carolina*